RLC:BSK
F. #2008R02053

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-09-263**

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

LUIS CASTILLO,
FAUSTO REYNOSO,
    also known as "Waldo"
    and "Guaro," and
FERNANDO SALVADOR SANCHEZ,
    also known as "Don,"

    Defendants.

- - - - - - - - - - - - - - - - - - -X

C O M P L A I N T

(Title 21, U.S.C., § 846)

EASTERN DISTRICT OF NEW YORK, SS:

    WAYNE HAUSER, being duly sworn, deposes and says:

    On or about and between April 1, 2008 and March 18, 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LUIS CASTILLO, FAUSTO REYNOSO, also known as "Waldo" and "Guaro," and FERNANDO SALVADOR SANCHEZ, also known as "Don," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved one kilogram or more of a substance containing heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

    (Title 21, United States Code, Sections 846 and 841(b)(1)(A)(i)).

I.  **Qualifications and Sources of Information**

   1.  I, Wayne Hauser, am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been a DEA Special Agent for approximately nine years. I am currently assigned to the New York Organized Crime Drug Enforcement Strike Force ("Strike Force") located in New York, New York. As a Special Agent with the DEA, I am tasked with investigating narcotics trafficking, money laundering and other offenses. During my tenure with the DEA, I have participated in numerous narcotics investigations during the course of which I have conducted physical and wire surveillance, executions of search warrants, and reviews and analyses of numerous taped conversations and records of drug traffickers. Through my training, education and experience -- which has included numerous instances of debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, conducting searches of locations where drugs and money have been found, and conducting surveillance of individuals engaged in drug trafficking -- I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement.

   2.  The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, members of the DEA

and other law enforcement agencies and from review of various documents obtained by subpoena. In the portions of this affidavit that describe intercepted wire communications, virtually all of the information, unless otherwise indicated, is based upon my review of draft line sheets created by the monitoring DEA agents who intercepted the telephone call.[1] Furthermore, in the paragraphs below that describe surveillance within the United States, all surveillance was conducted by officers assigned to the New York Division of the DEA, including myself. The observations of the other involved law enforcement agents have been related to me to supplement the activities that I personally observed.

    3. In this Affidavit, I have described portions of certain telephone conversations that were intercepted during the course of court-authorized wire surveillance. I have not, however, summarized every pertinent intercepted call, nor have I included every pertinent part of the call that I have summarized. Moreover, any transcripts of intercepted calls are preliminary and in draft form. As such, the summaries set forth in this affidavit are preliminary in nature. My opinions concerning the meaning of coded or veiled conversations are based on my training and expertise

---

[1] The participants in the intercepted calls relied on in this affidavit spoke primarily in Spanish. For purposes of preparing this affidavit, your deponent relied upon English translations of the line sheets prepared by DEA translators, none of whom are certified interpreters.

developed as a result of investigating the distribution of controlled substances.

4. Unless otherwise indicated, identifications of individuals on the wire intercepted communications in this investigation were made through name and voice identifications of the defendants made by the law enforcement agents monitoring the wire interceptions. Agents initially identified each interceptee through the interceptee's identification of himself or herself by name during the course of the conversation in conjunction with available subscriber information. Thereafter, agents would identify the interceptee through either the use of their name or voice identification based upon comparisons with prior interceptions of that individual.

5. As set forth in the paragraphs below, there is probable cause to believe that the defendants are involved in the trafficking of narcotics, including heroin. Because I submit this affidavit for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth all facts known to me about this investigation and case.

II. **Background**

6. Since approximately May 2008, the DEA has been conducting an investigation relating to the distribution of heroin in the New York area by defendants FAUSTO REYNOSO, also known as "Waldo" and "Guaro," ("REYNOSO") and LUIS CASTILLO ("CASTILLO"),

and their associates. The DEA believes that the organization is a New York-based organization that imports kilogram quantities of heroin from Colombia and the Dominican Republic. The DEA believes that the heroin imported by the organization is distributed in various locations in the Eastern and Southern Districts of New York, including in Brooklyn and the Bronx. The organization used sophisticated means to attempt to conceal its unlawful activities from law enforcement, including the use of prepaid cellular telephones that were frequently dropped to communicate with other members of the organization.

### III. Court-Authorized Interceptions

7.  Since June 2008, based on facts set forth in my affidavits, the DEA has obtained court-authorized orders for the interception of telephones being used by defendants REYNOSO, CASTILLO and others. These interceptions, corroborated by surveillance and three seizures in the New York area, have revealed that REYNOSO, a Dominican male, is a heroin trafficker who obtains kilogram-quantities of heroin from various sources of supply. The interceptions have also revealed that CASTILLO is a Dominican customer of REYNOSO.

8.  During the course of the investigation, several telephones were intercepted pursuant to court-ordered interceptions, including the following telephones used by the defendants as set forth below:

(A)) SPRINT/NEXTEL (718) 650-2197, UFMI: 173*875*1924, (the "2197 Telephone"), used by defendant LUIS CASTILLO;

(B) SPRINT/NEXTEL (347) 403-7629, UFMI: 173*870*3700 (the "7629 Telephone") being used by defendant FAUSTO REYNOSO; and

(C) SPRINT NEXTEL WIRELESS TELEPHONE (347) 408-2540, IMSI 316010160018412 (the "2540 Telephone") used by defendant FAUSTO REYNOSO.

## IV. Summary of Selected Interceptions

9. On September 19, 2008, defendant LUIS CASTILLO was intercepted over the 2197 Telephone speaking with defendant FAUSTO REYNOSO. During the call, CASTILLO asked, "Do you have something good around there?" REYNOSO replied, "What?" CASTILLO then asked, "Do you have something good! Good! Good! Around there?" REYNOSO then asked, "Who is speaking?" CASTILLO replied, "Luis." REYNOSO replied, "Oh! Not right now. That's for tomorrow." REYNOSO replied, "Tell me." REYNOSO was then heard speaking, asking a third person: "Do you have any there? How much is it? Give me one." CASTILLO then said, "I'll call you back." I believe that, during this call, CASTILLO is asking his source of supply, REYNOSO, if he has high purity heroin available. Once REYNOSO confirms that he is speaking with one of his customers, he informs CASTILLO that he expects to have the drugs available for CASTILLO the following day. While REYNOSOO is speaking with CASTILLO, he is

also discussing the price and quantity of a separate transaction with a third person.

        10. On November 7, 2008, FAUSTO REYNOSO was intercepted over the 2540 Telephone speaking with male known as "Francis," calling from the Dominican Republic. During the call, Francis said, "I'm calling you because our ship just rolled in here." REYNOSO replied, "Are you kidding me?" Francis then said, "Listen buddy, there's a hell of a movement here." REYNOSO asked, "How come?" Francis replied, "Because a couple of 'calves' showed up." REYNOSO then said, "I told you! I knew it! Right?" Francis said, "Of course. This female friend of mine was telling me just now. She is from our neighborhood and she was telling me that they were selling a lot of 'calves' . . . Even Enrique is dealing there . . . That everybody is doing that. So if you have time now, send some money so I can go and buy that. I'll position myself in and then I'll call you back." REYNOSO asked, "What are they going for? Do you know?" FRANCIS replied, "No, I don't know, but they are selling them fast." REYNOSO asked, "Okay. So you can talk with Enrique? Isn't he in it?" Francis replied, "Yes, but they are buying the 'calves' for themselves, because they are grabbing onto the 'hot meat' . . . The best of what is there and right away." REYNOSO then asked, "But you can do the same thing, right?" Francis replied, "Yes, I'm going to get in touch with the girl now because the guy is her friend. They are neighbors. The

guy got thirty-five (35) calves." REYNOSO replied, "Oh, Lord! But do something, so we can grab at least one whole one." Francis then said, "Yes, I asked her what they are going for. I'm going to run the errand with her now to get at least five or six." REYNOSO replied, "Okay. Go ahead and get on that . . . If I have to go down there, I'll go." Francis said, "Okay. That's what I told her . . . That if she makes the connection for me, I'll call you so you can come down right away." REYNOSO said, "Exactly. You have to check the price and I'll go down there right away. Hurry up and let me know right away." Francis replied, "Okay. Let me put Machina on. She wants to talk to you. We'll keep talking later." Francis then passed the phone to a woman known as "Machina." Machina said, "Yesterday morning, the woman told me that at 11:30 she was going to eat. She told me to go and eat." REYNOSO replied, "Tell FRANCIS to get on top of that." I believe that, during this call, Francis, who had called from the Dominican Republic, was telling REYNOSO that an associate of his had stated that approximately 35 kilograms of heroin ("calves") had arrived in the Dominican Republic, and that a portion of the 35 kilograms of heroin was available for purchase. I further believe that Francis told REYNOSO to send him money so that Francis could reserve the drugs with a down payment ("send some money so I can buy that") because the drugs were being sold quickly. REYNOSO in turn asked FRANCIS what the price of the drugs per kilogram was ("what are

they going for?)", and instructed Francis to reserve at least one kilogram. Francis told REYNOSO, in substance, that he would reserve approximately five or six kilograms for REYNOSO. REYNOSO then offered to travel to the Dominican Republic to receive the drugs.

## V.   The First Seizure

11. On January 18, 2009, conversations intercepted over the 2540 Telephone being used by FAUSTO REYNOSO, revealed that an individual identified as "Papo" would be traveling from Worcester, Massachusetts to G & T Auto Repair, 1495 Inwood Avenue, Bronx, New York, ("Subject Premises #1") to receive a quantity of heroin from REYNOSO. As a result, at approximately 2:00 p.m., I and other Strike Force agents commenced surveillance at Subject Premises #1.

12. At approximately 3:00 p.m., the male identified as "Papo" was intercepted over the 2540 Telephone speaking with FAUSTO REYNOSO. During the call, Papo told REYNOSO that he (Papo) would arrive at the shop in approximately thirty minutes.

13. At approximately 4:40 p.m., I observed a male Hispanic at the corner of Inwood Avenue and 172nd Street, Bronx, New York, one-half block south of Subject Premises #1. At that time, I observed FAUSTO REYNOSO walk from Subject Premises #1 to the corner of Inwood and 172nd and meet with the male Hispanic, who I believe was Papo. I then observed both REYNOSO and the male Hispanic, who I believe was Papo, enter Subject Premises #1.

14. At approximately 6:30 p.m., I observed the male I believe was Papo exit Subject Premises #1 and enter a New York City Transportation commuter van. I and other agents followed the van to the corner of St. Nicolas Avenue and 169th Street in Manhattan, where I observed Papo exit the van and immediately enter an identical van, along with the other passengers.

15. At approximately 7:05 p.m., I observed the second van depart from the street corner at which Papo had entered the van. I and other DEA agents continued to surveil this van as it traveled north on the Bronx River Parkway to the Cross County Parkway to the Hutchinson River Parkway to the Merritt Parkway into Connecticut. At that time, we were joined in our surveillance by Connecticut State Troopers.

16. At approximately 9:45 p.m., Connecticut State Troopers stopped the van after observing the driver change lanes without signaling. A narcotics-detecting canine alerted to the presence of drugs in the van. I asked Papo for consent to search his person. Papo gave me consent; around his waistband, I found a package wrapped with blue tape containing approximately 200 grams of a substance which field-tested positive for heroin. At that time I placed Papo under arrest. During post-arrest questioning, Papo stated that he had obtained the heroin at the address of Subject Premises #1 from a male he knew as "Guaro." I am aware, from reviewing transcripts of conversations intercepted during the

court-authorized wiretaps, that FAUSTO REYNOSO uses the alias of "Guaro."

17. Between January 19, 2009 and January 21, 2009, several call were intercepted over the 2540 Telephone in which FAUSTO REYNOSO attempted to contact Papo. In addition, during the same time period, conversations were intercepted between FAUSTO REYNOSO and the individual who had sent Papo to pick up the drugs; in these conversations, REYNOSO and the other male discussed the fact that Papo had never arrived with the heroin.

## VI. **The Second Seizure**

18. On February 10, 2009, FAUSTO REYNOSO was intercepted several times over the 2540 Telephone speaking with LUIS CASTILLO about a sale of 400 grams of heroin. According to the intercepted conversations, CASTILLO had in his possession 100 grams of heroin and needed an additional 400 grams to make a 500 gram sale to one of his customers. Based on these intercepted conversations, DEA agents commenced surveillance at Subject Premises #1 at approximately 4:00 p.m. At approximately 6:20 p.m., DEA agents observed REYNOSO exit Subject Premises #1 and walk out of view. At approximately 6:26 p.m., DEA agents observed REYNOSO enter Subject Premises #1 carrying a black plastic bag which appeared to be full. At approximately 8:10 p.m., DEA agents observed a white van drive up to Subject Premises # 1. At that time, the driver of the van exited the van and entered Subject Premises # 1. At approximately

8:20 p.m., DEA agents observed the driver of the van exiting Subject Premises #1. The agents observed that the driver appeared to be stuffing something into the front pocket of his jacket. At approximately 8:25 p.m., officers with the New York Police Department effected a traffic stop on the white van. After obtaining consent to search the van, the officers found the driver, identified as Augustin Henriquez, with a package wrapped with blue tape in his jacket pocket. This package was similar to the package seized from Papo on January 19, 2009. The package was found to contain approximately 220 grams of a substance which field-tested positive for heroin.

### VII. The Third Seizure and Arrests

19. On March 18, 2009, FAUSTO REYNOSO was intercepted several times over the 2540 Telephone speaking with LUIS CASTILLO about a sale of heroin which would ultimately be made to a male they referred to as "Don," later identified as FERNANDO SALVADOR SANCHEZ. Over the course of approximately five conversations, REYNOSO and CASTILLO discussed the fact that they would pool the heroin each had and sell the combined quantity to "Don." At approximately 12:00 p.m., I commenced surveillance of SUBJECT PREMISES #1, the automobile repair shop operated by REYNOSO, located at 1495 Inwood Avenue, Bronx, New York. At approximately 3:00 p.m., I received information from other DEA agents that CASTILLO had been intercepted speaking with REYNOSO. During this

conversation, CASTILLO had asked REYNOSO to meet at CASTILLO's house in Brooklyn and to bring "ten little ones," which I believed was a reference to ten pellets of heroin, each containing 10 grams of heroin, or 100 grams of heroin total. Over the next several hours, I received information from other DEA agents that REYNOSO was coming to Brooklyn to meet CASTILLO and deliver to CASTILLO approximately 100 grams of heroin. The intercepted calls indicated that CASTILLO would combine this heroin with approximately 50 grams of his own heroin. The intercepted calls also indicated that CASTILLO would have the customer for the heroin, known as "Don," with him in the same vehicle when CASTILLO and REYNOSO met. In another call between CASTILLO and REYNOSO, CASTILLO requested that REYNOSO bring "twelve" instead of "ten."

20.   At approximately 5:00pm, I and other agents established surveillance at 677 Park Avenue, Brooklyn, New York, an apartment used by CASTILLO ("SUBJECT PREMISES #2"). According to the intercepted calls, CASTILLO and REYNOSO were to meet at SUBJECT PREMISES #2. At approximately 6:00 p.m., I observed REYNOSO arrive in a black Mercedes Benz in front of SUBJECT PREMISES #2. There were no parking spots available in front of SUBJECT PREMISES #2, and REYNOSO continued to drive slowly around the corner. I and another agent stopped REYNOSO's vehicle, and I asked REYNOSO to step outside of the vehicle. I received REYNOSO's consent to search his person. During the search, I found a small package in

his waistband which contained 12 pellets. The pellets contained a substance which field-tested positive for heroin. The pellets, including their contents, weighed approximately 175 grams in total. REYNOSO was then placed under arrest.

21. At about the same time that REYNOSO was placed under arrest, CASTILLO and FERNANDO SALVADOR SANCHEZ arrived in a gold Acura and stopped in front of SUBJECT PREMISES #2. Other agents placed both CASTILLO and SANCHEZ under arrest.

22. After he was arrested, REYNOSO agreed to waive his Miranda rights, and stated that he was bringing the seized heroin to CASTILLO and that the drugs were intended for the person who was supposed to be in the same vehicle with CASTILLO.

23. After he was arrested, CASTILLO agreed to waive his Miranda rights, and stated that he was supposed to receive heroin from REYNOSO. CASTILLO also stated that he had given 50 grams of heroin earlier that day to a black female from Long Island and she was supposed to receive the additional heroin from REYNOSO.

Wherefore, it is respectfully requested that defendants

LUIS CASTILLO, FAUSTO REYNOSO, also known as "Waldo" and "Guaro," and FERNANDO SALVADOR SANCHEZ, also known as "Don," be dealt with according to law.

_____
WAYNE HAUSER
Special Agent
Drug Enforcement Administration

Sworn to before me this
19th day of March, 2009

‾‾‾
ǵE